# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALONNA S.[1],<br>　　　*Plaintiff*,<br><br>　　　v.<br><br>LELAND DUDEK, Commissioner of Social<br>Security[2],<br>　　　*Defendant*. | No. 3:23-cv-1594 (VAB) |

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Alonna S. ("Plaintiff" or "Claimant") has filed an administrative appeal under 42 U.S.C.

§§ 405(g) and 1383(c)(3) against Kilolo Kijakazi, former Acting Commissioner of Social

Security ("Commissioner"), seeking to reverse the decision of the Social Security Administration

("SSA") denying her claims for Title II Disability Insurance Benefits ("DIB"), or, in the

alternative, to remand the case for a new hearing. The Commissioner has moved to affirm the

decision.

---

[1] In opinions issued in cases filed under § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Leland Dudek became the Commissioner of Social Security on February 16, 2025. Under Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for Kilolo Kijakazi as the Defendant in this suit. No further action need be taken. 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

For the reasons explained below, Alonna S.'s motion to remand for a new hearing is **DENIED** and the Commissioner's motion is **GRANTED**. The decision of the Commissioner is **AFFIRMED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

#### 1. Medical History

Alonna S. alleges that the onset of her disability for the purposes of social security was September 1, 2021. Memo. in Supp. of Mot. to Reverse Decision of the Comm'r at 1, ECF No. 13-1 (Feb. 6, 2024) ("Memo. in Supp.").

Before this date, Alonna S. had been diagnosed with post-traumatic stress disorder ("PTSD') and experienced chronic migraines. Social Security Transcripts at 438, ECF No. 11 (Jan. 25, 202) ("Tr.").

On June 16, 2021, Alonna S. visited Dr. Sanjay P. Rathi, a neurologist, for treatment for her migraines. *Id.* Alonna had been taking Emgality for her migraines. Dr. Rathi reported that this medication "appears to have provided significant relief as the patient previously suffered with intractable migraines." *Id.* Alonna S. still experienced "breakthrough migraines occurring in the setting of chronic suppression that is supposed to be achieved with Emgality." *Id.* These breakthrough migraines were reported to be severe and occurred "once or twice every month." *Id.* They were resistant to other migraine medications, Ubrelvv and Nurtec. *Id.* So, when they occurred, Alonna S. reported that "all she c[ould] do [wa]s 'take the day off and rest' until the migraine dissipate[d]." *Id.*

On July 6, 2021, Alonna S. visited Physician Assistant ("PA") Julie Gedalecia, her primary care provider. *Id.* at 416. PA Gedalecia noted that Alonna S. reported struggling with

anxiety, depressed mood, increased stress, and poor memory. *Id.* She noted that Alonna S. had a

PTSD diagnosis that stemmed from trauma related to the death of her daughter in 2014 and an

abusive relationship with her former husband. *Id.* PA Gedalaecia recommended therapy as a

"first line" treatment for the PTSD and medication as a second. *Id.* at 417.

On July 19, 2021, Alonna S. visited PA Gedalecia for a follow-up appointment. *Id.*  at

414. Alonna S. was "incredibly anxious and tearful" during the appointment. *Id.* She had a desire

to get paid medical leave or disability to pursue PTSD treatment, but was "very confused" about

the process and anxious to get advice from her employer's human resources department due to

fear of retaliation. *Id.* PA Gedalecia prescribed lorazepam to take as needed for anxiety. *Id.*

On July 21, 2021, Alonna S. had a pre-intake phone call with Advanced Practice

Registered Nurse ("APRN") Beth Robins Roth for treatment of PTSD. *Id.* at 461. APRN Roth

noted that Alonna S. had diagnoses of PTSD, persistent complex bereavement disorder, anxiety,

depression, chronic insomnia, and migraine headaches. *Id.* Alonna S. reported symptoms of

"constant fear, worry, dread, inability to focus or concentrate, very poor short-term memory,

inability to be physically still, difficulty sleeping, frequently crying, rumination and

perseveration about her daughter's death." *Id.* at 462. She reported that she was "filled with

dread" about the work week. *Id.*

On August 2, 2021, Alonna S. had an initial visit with APRN Roth. *Id.* at 463. APRN

Roth noted that Alonna S. had been "increasingly unable to focus or concentrate, [wa]s rocking

and shaking and pacing and crying throughout the workday and dreading returning to work each

Monday." *Id.* She had applied for medical leave under the Family and Medical Leave Act

("FMLA") and short-term disability assistance. *Id.* APRN Roth noted that Alonna S. had had

increased headaches in the last six months, but "usually ha[d] only one migraine per month. *Id.*

During the appointment, APRN Roth observed that Alonna S. had "motor activity with constant involuntary rocking movements of torso and wringing of hands." *Id.* APRN Roth taught Alonna S. exercises to limit the physical effects of anxiety. *Id.*

On August 3, 2021, PA Gedalecia stated that Alonna S. had moderately impaired concentration and mildly impaired memory. *Id.* at 528. PA Gedalecia specified that Alonna S. exhibited an impairment with "completion of tasks" and was "struggling to concentrate and stay on task." *Id.* at 530. She also noted that Alonna S. had severe anxiety, including around going to work, and that "continuing to work is worsening her illness." *Id.* As a result, PA Gedalecia had recommended that Alonna S. stop working "immediately." *Id.*

On October 21, 2021, Alonna S. visited APRN Roth for a therapeutic session to help treat her PTSD, insomnia, anxiety, and chronic headaches. *Id.* at 481. APRN Roth noted that Alonna S. was "alert and oriented" and had intact judgment and thought processes. *Id.*  She also noted that Alonna S. had some "motor activity with involuntary rocking movements of the torso" during the session. *Id.* Alonna S. expressed increased anxiety due to the approaching anniversary of her daughter's death, the impending end of her short-term disability payments and medical leave, and physical health. *Id.*

On October 27, 2021, Alonna S. visited APRN Roth again. APRN Roth worked with Alonna S. on exercises to limit her involuntary rocking. *Id.* at 483. Alonna S. expressed concern over the cost of the co-payments for her visits with APRN Roth. *Id.* at 484. APRN Roth noted that it was "very important for [Alonna S.] to have at least bi-weekly appointments . . . until she feels she[ is] making more significant progress in treatment." *Id.*

On November 18, 2021, Alonna S. was given a depression screening by her primary care provider, PA Gedalecia. *Id.* at 610. Her score demonstrated "severe depression." *Id.*

On December 17, 2021, Alonna S. visited PA Gedalecia. *Id.* at 608. The records note she had been taking Lexapro. *Id.* She reported that she had "notice[d] a gradual improvement" since starting the medication. *Id.* She had no adverse side effects and Lexapro was helping "take the edge off." *Id.*

On January 11, 2022, Alonna S. visited PA Gedalecia. *Id.* at 606. She continued to experience "some improvement" in anxiety symptoms as a result of the Lexapro. *Id.* PA Gedalecia noted, however, that Alonna S. "did not appear to be making as much progress as [she had] hoped for." *Id.* PA Gedalecia recommended trying additional medication and that Alonna S. declined. *Id.*

On February 18, 2022, Alonna S. attended one of her regular visits with APRN Roth. She stated that most days she "cook[s] and do[es] meal prep to have something to do," and "runs errands." *Id.* at 647. She additionally stated that "[s]ome days all [she] c[ould] manage is to make the bed" and that "if [she] g[ot] out of the house[,] that's a big deal." *Id.* She reported that she had had "headaches recently but not migraines." *Id.*

On January 23, 2022, Alonna D. visited APRN Hilary Sullivan to ger recertified for medical marijuana. Alonna S. reported that the medical marijuana helped "'take the edge off' and manage her anxiety." *Id.* at 659.

On July 19, 2022, Alonna S. visited Dr. Rathi. He noted that "Emigality appears to have provided significant relief." *Id.* at 669. Alonna S. reported that with Emigality, severe migraines were "few and far between." *Id.* at 671. And that, when these migraines occurred, over-the-counter medications such as Aleve provided a "blunting effect." *Id.*

### 2. Activities of Daily Life and Hearing Testimony

At the hearing, Alonna S. testified that she was unable to work because she found it "very difficult to focus for long periods of time" and had poor short-term memory. *Id.* at 50; *see also id.* at 65 ("Q: . . . "Now , is there anything that stops you from working that you have not told us about? A: No, just the general shattered mind. You know, no focus, no concentration, the anxiety.").

She described the difficulties she had focusing and remembering things during previous employment:

> If I had made a phone call, I would sometimes forget who I even called and I have
> to hang up the phone and regroup. There is many, you know, account numbers,
> you know, that I would forget or transpose. It just became very overwhelming and
> I began to realize that I would do things over and over again or forget to do
> certain things. I was just unable to focus on one, even one account for, you know,
> a long period of time because some of the accounts would take about 20 minutes
> to review and to work through and it just became more and more difficult.

*Id.*

She additionally described memory and focus problems that occurred in her everyday life:

> [I]f I'm cooking, I could open up a cabinet that's right above the stove and not
> even know why I went I there. I have reminders to take my medicine. I use Waze
> so I can focus, on, you know, make sure I'm headed in the right direction.
> Sometimes watching a movie will take me all day. . . . I'll have to constantly
> rewind because I lost focus and wasn't paying attention.

*Id.* at 56–57.

Alonna S. also testified that she had difficulties socializing, stating that she "ha[d] a hard time remembering names" and that she sometimes "forg[ot] what [she was] saying in the middle of a sentence." *Id.* at 52. She did state, however, that she was able to socialize with close friends, and regularly did so. *Id.* at 53.

Alonna S. testified that she lived alone and was able to prepare her own food, clean her home, practice personal hygiene, and go to grocery and convenience stores. *Id.* at 52–53.

### 3. Application Process and ALJ Decision

On September 14, 2021. Alonna S. filed an application for disability insurance benefits, alleging that disability began on September 1, 2021. *Id.* at 18. The claim was denied initially and upon reconsideration. *Id.*

On May 17, 2022, Alonna S. requested a hearing to review her applications. *Id.* at 18. She appeared before Administrative Law Judge John Aletta ("the ALJ") at a video hearing on October 27, 2022. *Id.* at 15.

Before that hearing, in a letter dated October 15, 2022, APRN Roth provided her opinion of Alonna's medical diagnosis, symptoms, and work ability. APRN Roth stated that Alonna's current diagnoses include PTSD, persistent complex bereavement disorder, chronic dysautonomia (dysfunction and dysregulation of the Autonomic Nervous System), irritable bowel syndrome (IBS), migraine headaches, anxiety disorder, panic disorder, depression, chronic insomnia, and a history of adult domestic abuse. *Id.* at 673.

Alonna S.'s symptoms were said to include:

> chronic digestive system tightness and pain; alterations in appetite and food intake with resulting fluctuations in weight; tension and migraine headaches; constant involuntary gross motor movements primarily rocking of torso/upper body; constant involuntary fine motor movements of fingers of both hands; intermittent tachycardia, tachypnea, and electrodermal dysregulation resulting in temperature changes and sweating; and frequent and unpredictable changes in physical energy and motivation for all tasks and activities.

*Id.*

APRN Roth also noted that Alonna S. experienced common PTSD symptoms such as "severe anxiety, panic attacks, depression, hypervigilance, hyperarousal, sleep disorders,

voidance of triggering stimuli, and difficulties with sustained social interactions.,” as a well as cognitive impairments. *Id.* at 673. With respect to cognitive effects, APRN Roth stated:

> These include severe deficits in focus, concentration, and attention; problems with short-term memory, word finding, and language processing speed; and decreased executive function as evidenced by hyper-attention to organization and time management and difficulties with conceptualizing and planning sequential tasks. [Alonna S.'s] thought processes are also greatly impacted by PTSD, the bereavement disorder, and anxiety, panic, and depression. She experiences constant mental rumination, perseveration, catastrophizing, highly distracting intrusive thoughts and physical sensations, and unrealistic demands for self-perfection paired with resulting self-questioning and self-criticism.

*Id.* And, due to social anxiety, Alonna S. “avoid[s] most people and social situations.” *Id.*

APRN Roth wrote that to help her with these various symptoms, Alonna had an emotional support animal and employed strategies including “written lists, post-it notes, reminder alarms on her phone, and programming her Amazon Alexa App.” *Id.* Despite these cues, APRN Roth stated, Alonna S. continued to have “difficulty with concentration and short-term memory.” *Id.*

APRN Roth concluded:

> [Alonna S.'s] medical condition interferes with normal functioning and makes routine activities of daily living very challenging. It is difficult for her to get out of bed in the morning and face another day. She becomes physically exhausted and mentally overwhelmed by even brief and simple activities, such as grocery shopping and house cleaning. She cannot remember if she just completed a task such as feeding her dog or washing the dishes and must check and re-check herself multiple times. She is continuously flooded by internal stimuli, making it difficult to absorb and comprehend information from outside herself, such as verbal instructions or explanations from others about tasks she needs to complete. She cannot sustain concentration while reading, watching a TV program or movie, or engaging in conversation and social interaction with others. Her involuntary gross and fine motor movements, and sudden dramatic mood shifts are a disruption to her and distracting to others. She cannot keep track of what she is thinking or doing, causing the accumulation and disorganization of important papers, documents, and bills. She is easily startled by sudden loud noises and distracted by normal sounds and indoor environmental lighting. She has been forced to constrict and limit her world in order to make it manageable.

*Id.*

In APRN Roth's opinion, this "constellation of somatic, psychological, emotional, and cognitive symptoms and the behavioral and functional impairments they produce make it impossible for [Alonna S.] to function in a work environment at this time." *Id.*

After the hearing, the ALJ issues a decision explaining the rationale for his finding that Alonna S. was not disabled. *Id.* at 18–30. When determining whether a claimant is disabled, the ALJ must follow a five-step evaluation process, assessing

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d at 150 (citing *Burgess*, 537 F.3d at 120; 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)).

At Step One, the ALJ found that Alonna S. had not engaged in substantial gainful activity since the alleged onset date of her disability, as she was no longer working. Tr. at 20–21.

At Step Two, the ALJ found that Alonna S. had the severe impairments of migraines, PTSD, major depressive disorder, anxiety disorder, adjustment disorder, and persistent complex bereavement disorder. *Id.* at 21.

At Step Three, the ALJ found that Alonna S. did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. *Id*. at 21.

At Step Four, the ALJ found that Alonna S. had a residual functional capacity ("RFC") to perform "medium work" with the limitations that:

She can frequently climb ramps and stairs; can occasionally climb ladders, ropes

or scaffolds; and can frequently balance, stoop, kneel, crouch and crawl. She can work in environments having a moderate noise level; must avoid concentrated exposure to vibration; must avoid concentrated exposure to dust, fumes, odors, gases and pulmonary irritants; and cannot work at unprotected heights or operate machinery having moving, mechanical parts which are exposed. She can perform simple, routine tasks but not at a strictly enforced, production rate pace and can execute short, uninvolved instructions. She can tolerate occasional, brief interaction with the general public. She can adhere to basic standards for personal hygiene and personal behavior ordinarily found in the work place. She can tolerate occasional, minor changes in her work setting and work procedures.

*Id.* at 23. He determined that Alonna could not do her past work with these limitations. *Id.*

Finally, at Step Five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Alonna S. could perform, such as laundry worker, stores laborer, and dining room attendant. *Id.* at 29.

The ALJ thus concluded that Alonna S. did not have a disability as defined by the Social Security Act between September 1, 2021 and the date of his decision, November 21, 2022. *Id.* at 12.

On January 10, 2023, Alonna S. requested review of the ALJ decision. Memo. in Supp. at 1.

On November 1, 2023, the Appeals Council denied Alonna S.'s request. *Id.* Alberta T. then appealed to this Court. *Id.*; Compl., ECF No. 1 (Dec. 5, 2023) ("Compl.").

**B. Procedural History**

On February 6, 2024, Alonna S. filed a motion seeking to reverse the decision of the Commissioner of Social Security. Mot. to Reverse Decision of the Comm'r, ECF No. 13 (Feb. 6, 2024).

On March 20, 2024, the Commissioner filed a motion to affirm the decision. Mot. to Affirm the Decision of the Comm'r, ECF No. 16 (Mar. 20, 2024); Memo. in Supp. of Mot. to Affirm the Decision of the Comm'r, ECF No. 16-1 ("Comm'r's Memo.").

## II.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla." *Brault*, 683 at 447  (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). It is generally "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur*, 722 F.2d at 1038).

When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, No. 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). On the other hand, "[a]n ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). A court generally need not remand a case if the ALJ only

committed harmless error, such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.   DISCUSSION

Alonna S. raises three arguments: (1) the ALJ erred in finding that Alonna S. was not significantly limited by her migraines and mental impairments when determining the RFC; (2) the ALJ improperly evaluated medical opinions when determining the RFC; and (3) the ALJ's conclusions in Step Five were unsupported by substantial evidence.

The Court considers each argument in turn.

### A.  The Step Four Analysis: Residual Functional Capacity

Step Four requires the ALJ to "ascertain [the claimant's] residual functional capacity." *State of N.Y. v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990). The RFC is the "most you can still do" despite "physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545. The claimant has the burden of proving his or her limitations at Step Four. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four[.]" (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008))).

### 1. Assessment of Migraines and Mental Health Impairments

Alonna S. argues that the ALJ did not adequately consider the severity and frequency of her breakthrough migraines. Memo. in Supp. at 24. Alonna S. also argues that the ALJ erred in concluding that Alonna S.'s other severe impairments—PTSD, depression, anxiety, and complex bereavement—did not preclude Alonna S. from working.

The Commissioner argues that the ALJ's formulation of the RFC is supported by

substantial evidence, and that the ALJ properly assessed each of Alonna's impairments including

migraines.

The Court agrees.

As the ALJ noted, the record demonstrates that Emgality reduced the occurrence of

Alonna S.'s migraines to once or twice a month. *See id.* at 396 ("On Emgality, the patient has

little if any migraines."); *id.* at 401 (noting that "Emgality appears to have provided significant

relief" and that "severe migraines occur only once or twice a month"); *id.*at (reporting that

Alonna S. "usually has one migraine per month"); *id.* at 58 ("[ALJ:] So tell me on average in the

last roughly year, year and a half, how many migraines are you getting per month? [Alonna S.:] I

would still say the one to two."). Additionally, over-the-counter medication provided some relief

for the migraines that still occurred, and the intensity and occurrence of migraines could be

further reduced by Lexapro. *See id.* at 671 ("[O]ver-the-counter anti-inflammatory/analgesic

preparations . . . provide her some 'blunting effect' with regards to intensity of pain for

breakthrough migraines. . . . She remains on generic Lexapro, 20 mg daily, which should be

providing some preventative benefits pertaining to migraine frequency and intensity.").

The ALJ found that these "residual symptoms [of migraines were] reasonably addressed

via limitation to the lifting and carrying of medium work" as well as the "limitations on noise,

vibration, dust, fumes, odors, gases, and other triggers, and workplace hazards." *Id.* at 27. The

ALJ's determination is consistent with the opinion of state agency reviewer, Dr. Robert Decarli,

who recommended limiting exposure to vibrations, noise, and fumes, and dust because they

"may incite a migraine episode with associated symptoms as described in the evidence." *Id.* at

96; *see also id.* at 404 (recommendation by neurologist Dr. Rathi's for Alonna S. to employ "nonpharmacological approaches to the management of migraine").

Given this evidence, the ALJ's determination that Alonna S.'s migraines could be addressed by the limitations in the RFC is reasonably supported by the record. *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) ("The phrase 'substantial evidence' . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938))); *see, e.g., Carter v. Colvin*, No. 2:14-cv-46, 2015 WL 1186280, at *6 (D. Vt. Mar. 16, 2015) (concluding that ALJ's determination of mild limitations due to migraines was supported by the record when plaintiff's migraines occurred "only one to two times monthly" and were managed by medications).

As to Alonna S.'s mental health impairments, the ALJ concluded that "the longitudinal behavioral health records do not document the debilitating symptoms and limitations alleged." Tr. at 27. The ALJ found that the record "d[oes] not document cognitive impairment of the severity alleged" and that "[w]hile the evidence supports a finding that the claimant can no longer perform her demanding past work she remains able to perform simple, routine tasks and execute simple instructions."

Alonna S.'s primary care provider and a neurologist provided evidence that she had mild to moderate impairments in concentration and memory. *See, e.g., id.* at 508 (Dr. Rathi's note after memory test that "short-term recall is poor" and "patient is clearly distracted"); *id.* at 528 (PA Gedalecia's rating of concentration as moderately impaired and memory as mildly impaired on state short-term disability report). The record also contains evidence, however, that other cognitive skills including judgment and thought process remained intact, and that she could do

basic tasks. *See, e.g.*, *id.* at 605 (PA Gedalecia's note that insight was good, judgment was intact, and cognition was oriented); *id.* at 623 (APRN Roth's note that Alonna S. was alert and oriented, had intact judgement, good insight, and intact thought process); *id.* at 528 (PA Gedalecia's rating of attention as intact on state short-term disability report); *id.* at 403 (Dr. Rathi's note that Alonna S. was alert and oriented and had intact comprehension).

Alonna S. was also managing the symptoms of her mental health impairments with therapeutic exercises taught to her by APRN Roth, the medications Lexapro and lorazepam (Ativan), and medical marijuana. *See, e.g.*, *id.* at 629 ("She said that yesterday when she was upset and angry, she did aah vocalizations and the slow joint mobilization movements of the head, neck and shoulders. These things helped."); *id.* at 608 ("Has successfully taken Lexapro every day, which she didn't think she'd be able to do. She has noticed a gradual improvement in mood since starting, 'takes the edge off.'"); *id.* at 659 ("She has been using medical marijuana for the past couple of years with good effect. She reports it helps to 'take the edge off' and manage her anxiety[.]"). Consistent with this evidence, Alonna S. testified that while she struggled with memory and concentration in her old job, she lived alone and was able to prepare her own food, do own chores, go to grocery and convenience stores, and socialize with others. See *id.* at 52–53.

The full record thus supports the ALJ's conclusion that Alonna S.'s mental impairments were not wholly debilitating and could be addressed with the limitations in the RFC and medical treatment. *See, e.g.*, *Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) ("[S]ubstantial evidence in the record supports the ALJ's conclusion that this plaintiff, with the proper treatment, could perform work on a regular and continuing basis. . . . The treatment notes support the ALJ's conclusion that plaintiff was stable and responded well to treatment."); *Douglas v. Comm'r of*

*Social Security*, 717 F. Supp. 3d 289, 296 (W.D.N.Y. 2024) (affirming decision of ALJ when plaintiff "retained some ability to function from a mental standpoint" despite his anxiety, and the ALJ "noted that the RFC included limitations for Plaintiff's social anxiety").

Accordingly, the ALJ's determination of Alonna S.'s RFC is supported by substantial evidence.

### 2. Consideration of Medical Opinions

An ALJ must "articulate in [their] determination or decision how persuasive [he or she] find[s] all of the medical opinions" in the case record. 20 C.F.R. § 404.1520(b). When determining the persuasiveness of a medical opinion, the "factors of supportability and consistence are the most important factors" considered. *Id.* § 404.1520(b)(2). "Supportability concerns the degree to which the objective medical evidence and supporting explanations presented by a medical source support the medical opinion; consistency concerns the degree to which the medical opinion is consistent with the other evidence in the record." *Rodriguez v. Kijakazi*, No. 21- CV-2358 (JCM), 2022 WL 3211684, at *11 (S.D.N.Y. Aug. 9, 2022).

Alonna S. alleges that the ALJ did not consider forms completed by PA Gedalecia for Alonna S.'s application for short-term disability insurance. Memo. in Supp. at 26. She specifically states that ALJ did not acknowledge PA Gedalecia's opinion on how much she could lift. *Id.* at 26. Alonna S. also argues that the ALJ improperly considered the opinion statement from APRN Roth to be unpersuasive and conclusory. *Id.* at 27.

The Commissioner argues that the ALJ's conclusions as to how much Alonna S. could lift and carry are consistent with the opinions of PA. Gedalecia. Comm's Memo. at 22. The Commissioner also argues that the ALJ properly assessed the persuasiveness of APRN Roth's opinion.

The Court agrees.

The ALJ found that Alonna S. had the residual functional capacity to perform "medium work." Tr. at 23. "Medium work" is defined in the Social Security regulations as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

PA Gedalecia provided the opinion that Alonna S. could frequently lift up to 35 pounds and frequently carry up to 30 pounds. Tr. at 521. This opinion is consistent with, and supportive of, the ALJ's determination that Alonna S. could do work requiring frequent lifting and carrying up to only 25 pounds.  The ALJ's determination is also consistent with other evidence in the record. *See, e.g.*, *id.* at 82 (determination by state agency physician that Alonna S. could occasionally lift up to 50 pounds and frequently lift up to 25 pounds); *id.* at 52 ("[ALJ:] And do you have any problems lifting or carrying objects? [Alonna S:] No.").

Furthermore, while the ALJ did not cite to the specific forms created by PA Gedalecia, "an ALJ is not required to discuss every piece of evidence submitted." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). And, an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.*; *see also Petrie v. Astrue*, 412 F. Appx. 401, 407 (2d Cir. 2011) ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) (per curiam)).

The ALJ's RFC determination is consistent with PA Gedalecia's opinion expressed in her report that Alonna S. could frequently carry 30 pounds and lift 35 pounds, and that Alonna S. had a moderate concentration impairment and mild memory impairment. *See* Tr. at 528. Additionally, the ALJ's RFC determination is supported by the totality of evidence in the record. As a result, the failure to mention this specific report is not a reversible error. *See, e.g.*, *Colin ex rel. N.T.C.B. v. Colvin*, 111 F. Supp. 3d 376, 388 (W.D.N.Y. 2015) ("In this case, Dr. Randall's opinion was consistent with the evidence discussed above. Further, although Plaintiff points out that Dr. Randall's opinion was not expressly mentioned in the context of attending and completing tasks, the ALJ is not required to mention every piece of evidence considered in making a decision. Thus, remand is not appropriate where we are able to look to other portions of the ALJ's decision to find clearly credible evidence supporting the ALJ's rationale and conclude that his decision was supported by substantial evidence." (citations omitted)); *see also Brogan-Dawley v. Astrue*, 484 F. Appx. 632, 634 (2d Cir. 2012) ("Even if the ALJ failed to explain the weight given to those opinions, agency reconsideration would be unnecessary because 'application of the correct legal principles in the record could lead [only to the same] conclusion.'" (quoting *Zabala*, 595 F.3d at 409)).

As to APRN Roth's opinion, the ALJ determined that it was not persuasive because she referred to "numerous signs and symptoms which were not noted in detailed, formal progress notes" and the opinion was "based on a generalized discussion of how PTSD affects individuals . . . rather than a function-by-function assessment of the claimant's abilities." Tr. at 28. The ALJ also noted that APRN Roth's opinions were "conclusory" and "not well supported." *Id.*

The ALJ's finding are supported by the record. For example, APRN Roth states in her opinion letter that Alonna S. has "difficulties with sustained social interactions," "avoids most

people and social situations" and struggles with "social isolation." In contrast to this statement,

APRN Roth reports in treatment notes that Alonna S. "has a few good friends, is close to one

cousin, and has a good relationship with her parents who come to her house for brunch every

Sunday." *Id.* at 462; *see also id.* at 644 (noting that Alonna S. went to celebrate a birthday with a

friend); *id.* at 467 (noting that Alonna S. has spent time socializing with a friend). Similarly,

while APRN Roth states in her opinion letter that Alonna S.'s impairments "make[] routine

activities of daily living very challenging," *id.* at 674, the record contains evidence that Alonna

S. is able to successfully manage activities of daily living. *See, e.g.*, *id.* at 81 (reporting that

Alonna S. "does chores, yard work, cares for dog[, runs] local errands, shops, post office, tends

to self care, cooks, . . . goes out alone, [and] pays bills"); *id.* at 52 ("[ALJ:] And do you prepare

food for yourself? [Alonna S.:] Yes. [ALJ:] Do you do cleaning at your home? [Alonna S.:] Yes.

. . . [ALJ:] And do you go to the grocery store or convenience store to get food items and other

things you need? [Alonna S.:] Yes.").

 The ALJ thus sufficiently considered the supportability and consistency of APRN Roth's

opinion. *See, e.g.*, *Krystal L.C. v. Comm'r of Social Security*, No. 3:24-cv-301 (KAD), 2025 WL

580285, at *5 (D. Conn. Feb. 21, 2025) ("[T]he ALJ did consider the persuasiveness of APRN

Villasenor and APRN MacMaster's opinions (*i.e.*, Plaintiff's treating providers), and adequately

explained why he found them to be minimally persuasive. Plaintiff's objection to the ALJ's

weighing of the medical opinion evidence does not, on this record, warrant reversal.").

 Alonna S. also suggests that the ALJ was required to develop the record after finding that

APRN Roth's opinion was inconsistent with the record. But, "where there are no obvious gaps in

the administrative record, and where the ALJ already possesses a complete medical history, the

ALJ is under no obligation to seek additional information in advance of rejecting a benefits

claim." *Franklin v. Saul*, 482 F. Supp. 3d 250, 267 (S.D.N.Y. 2020) (quoting *Rosa v. Callahan*, 168 F.3d 72,79 n.5 (2d Cir. 1999)) (cleaned up). Here, the record contained a complete medical history without any obvious gaps. The ALJ therefore had no duty to further develop the record. *See, e.g.*, *Brogan-Dawley*, 484 F. Appx. at 643 ("Nor did the ALJ need to develop the record further and recontact Dr. Sullivan. The ALJ was required to do so only if the records received were inadequate . . . to determine whether [Brogan–Dawley was] disabled, which was not the case here." (citations and internal quotation marks omitted)).

Accordingly, the ALJ properly considered medical opinions when determining Alonna S.'s RFC.

### B. The Step Five Analysis: Jobs Existing in the National Economy

Step Five shifts the burden to the Acting Commissioner "to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445. The ALJ may meet its burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x. 724, 276 (2d Cir. 2009) (citations omitted).

Alonna S. argues that the ALJ's hypothetical question was not supported by substantial evidence and did not accurately reflect Alonna S.'s impairments. Memo. in Supp. at 32–34.

The Commissioner argues that the hypothetical question relied on in the ALJ's decision reflected the RFC which was supported by substantial evidence. Comm'r Memo. at 24–25.

The Court agrees.

Alonna S. argues that the hypothetical's reliance on medium work lifting and carrying limits are not supported by substantial evidence, again citing the ALJ's failure to mention PA Gedalecia's opinion. As discussed above, the ALJ's failure to mention PA Gedalecia's opinion is not a reversible error, and the ALJ's conclusions as to the weight Alonna S. can lift are, in fact, supported by that opinion. And, since the Court concluded that the RFC was based on substantial evidence, the Court also concludes that the hypothetical question based on that RFC meets the substantial evidence standard. *See Salmini v. Comm'r of Social Sec.*, 371 F. Appx. 109, 114 (2d Cir. 2010) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").

Alonna S. also argues that the ALJ ignored a question asked by counsel to the vocational expert at hearing. Alonna S.'s counsel asked, "[If] the hypothetical person were to become tearful during the course of a day and rock back-and-forth and do other things that might be disruptive to others, what effect does that have on the ability to keep that job?" Tr. at 74. To which the vocational expert replied, "There would be no jobs for such an individual." *Id.*

But this question does not "accurately reflect the limitations and capabilities of the claimant," *Calabrese*, 358 F. Appx. at 276, as presented in the record. The phrase "other things that might be disruptive to others" is vague and does not reflect any specific limitation of Alonna S. *See Baker v. Berryhill*, No. 17-CV-8433, 2019 WL 1062110, at *35 (S.D.N.Y. Feb. 19, 2019) ("[I]t goes without saying that any hypotheticals posed to a VE must have adequate support in the Record, if the ALJ is then going to rely on the VE's responsive testimony as evidence that the claimant is not disabled."), *report and recommendation adopted*, 2019 WL 1059997 (S.D.N.Y. Mar. 6, 2019). Without clarity as to what these "other things" are and their specific

relationship to any identified impairment of Alonna S., the ALJ properly did not factor the vocational expert's response to that question in his ruling. *See id.* ("A vocational expert's testimony does not constitute substantial evidence where the ALJ asks about a hypothetical claimant whose limitations do not actually mirror those of the claimant."); *see also Mancuso v. Astrue*, 361 Fed.Appx. 176, 179 (2d Cir. 2010) ("The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence." (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)); *cf. McIntyre*, 758 F.3d at 152 ("[A]n ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace.").

Accordingly, the ALJ's determination at Step Five was supported by substantial evidence.

## IV.   CONCLUSION

For the reasons explained below, Alonna S.'s motion to remand for a new hearing is **DENIED** and the Commissioner's motion is **GRANTED**. The decision of the Commissioner is **AFFIRMED**.

**SO ORDERED** at New Haven Connecticut, this 28th day of March, 2025

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

`